Clark Law and Associates, LLC
Jina Clark, Formerly Jennie Clark OSB No. 000319
*jina@clarklawportland.com*
Jonathan R. Russell, OSB No. 220641
*jonny@clarklawportland.com*
6501 SW Macadam Ave. Suite E
Portland, OR   97239
(503) 238-1010
(503) 238-1212 (facsimile)
Of Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# EUGENE DIVISION

| | |
|---|---|
| **ANGELA CONNOLLY;** individually; **DR. NICHOLAS CONNOLLY;** individually; **A.C.,** a minor, by and through his guardian ad litem, Angela Connolly. <br><br> Plaintiffs, <br><br> v. <br><br> **CITY OF BEND,** a public entity; **OFFICER JEREMY AVERY,** in his individual capacity; **CORPORAL JARED WIEBOLD,** in his individual capacity; **DR. CLAYTON GARTHE,** in his individual capacity; **CENTRAL OREGON EMERGENCY PHYSICIANS LLC,** an Oregon Limited Liability Company**; ST. CHARLES HEALTH SYSTEMS, INC. DBA ST. CHARLES MEDICAL CENTER – BEND,** an Oregon corporation**; and DOES 1-10.** <br><br> Defendants. | **Case No.: 6:25-cv-1341** <br><br> **COMPLAINT** <br><br> 1. Fourth Amendment Violation – Unreasonable Search and Seizure (42 U.S.C. § 1983) <br> 2. Fourteenth Amendment Violation— Familial Association (42 U.S.C. § 1983) <br> 3. Fourteenth Amendment Violation— Procedural Due Process (42 U.S.C. § 1983) <br> 4. Supervisory Liability (42 U.S.C. § 1983) <br> 5. Municipal Liability (*Monell*) (42 U.S.C. § 1983) <br> 6. Failure to Intervene (42 U.S.C. § 1983) <br> 7. False Imprisonment <br> 8. Battery <br> 9. Assault <br> 10. Intentional Infliction of Emotional Distress <br> 11. Negligence <br> 12. Gross Negligence <br> 13. Medical Malpractice |

**Complaint** 1 of 33

**DEMAND FOR JURY TRIAL**

Plaintiffs Mrs. Connolly, Nicholas Connolly, and A.C. (a minor), through Clark Law & Associates, LLC, brings this Complaint against Defendants and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for claims brought against government entities and their employed officers acting under color of law for violations to civil rights protected by the U.S. Constitution and state and federal law.

## JURISDICTION AND VENUE

2. This Court has original jurisdiction of the federal claim contained in this Complaint pursuant to 42 U.S.C 1983. 42 U.S.C. § 12182(a)(B)(C) and 28 U.S.C. §§ 1331 and 1345 U.S.C. § 794).  The Court has supplemental Jurisdiction over the state tort claims pursuant to 28 U.S. Code § 1367(a).  Jurisdiction is proper in this Court because at all times material to this Complaint, Plaintiffs were residents of the Eugene Division of the District of Oregon.  Venue is proper in this Judicial District pursuant to 28 U.S. C. § 1391 (b) because the claim arose in this Judicial District.

## PARTIES

3. **Plaintiff Angela Connolly ("Mrs. Connolly")** is the biological mother of Plaintiff A.C. At all times relevant, Mrs. Connolly was a resident of Deschutes County, Oregon.

4. **Plaintiff Dr. Nicholas Connolly ("Dr. Connolly")** is the biological father of Plaintiff A.C.  At all times relevant, Dr. Connolly was a resident of Deschutes County, Oregon. Dr. Connolly has a medical background as an anesthesiologist.

5. **Plaintiff A.C.** is the biological child of Plaintiffs Mrs. Connolly and Dr. Connolly. At all relevant times, Plaintiff A.C. was a resident of Deschutes County, Oregon.

6. **Defendant Officer Jeremy Avery** is a sworn peace officer, who at all relevant times was employed by the Bend Police Department.

7. **Defendant Corporal Jared Wiebold** is a sworn peace officer, who at all relevant times, was employed by the Bend Police Department.

8. **Defendant City of Bend (Bend Police Department)** is a governmental organization operating in the Eugene Division of the District of Oregon. At all relevant times, Defendant Officer Jeremy Avery was employed as a police officer by the City of Bend.

9. **Defendant Dr. Clayton Garthe** is an individual who resides and is employed in Deschutes County, Oregon by Central Oregon Emergency Physicians, LLC. Defendant Dr. Clayton Garthe administered the investigatory physical examination to Plaintiff A.C.

10. **Defendant Central Oregon Emergency Physicians, LLC** employed Defendant, Dr. Clayton Garthe, and operates in hospitals including St. Charles Medical Center – Bend (St. Charles) where Dr. Garthe administered the investigatory physical examination to Plaintiff A.C.

11. **Defendant St. Charles Health Systems, Inc.** operates hospitals in Deschutes County, Oregon including St. Charles Medical Center – Bend (St. Charles) where it performed medical procedures on Plaintiff A.C.

**Defendant Does:** The true names and capacities of Defendants sued herein as Does 1-10 are currently unidentified medical personnel, including CT scan technicians, x-ray technicians, nurse, and staff members at St. Charles Hospital, who are unknown to Plaintiffs, and who are therefore sued as Doe Defendants by such fictitious names. Upon learning their nexus to this incident and their true identity, Plaintiffs will move to amend this Complaint to show the true names and capacities of such Doe Defendants. Does 1-10

were at all times acting within the course and scope of such relationship(s), and at all times acted under color of law.

## RELEVANT PRELIMINARY FACTS

**12.** On or about 12/5/23, A.C. and Mrs. Connolly went to the library where there is a play area.  A.C. was standing on a foam block trying to reach the ball and a funnel toy.  The foam block A.C. was standing on tipped causing A.C. to fall and strike his face against a wooden bin.  Mrs. Connolly took photos of the area and A.C.'s eye and sent the photos to Dr. Connolly to obtain his medical opinion of whether Mrs. Connolly needed to take A.C. to the doctor.  Mrs. Connolly stated in the text message with pictures that A.C. fell off the foam block at the library.  The foam stand A.C. was standing on can be seen in the screenshot.  The text states, "AJ fell standing on corner of foam block to place ball on top & hit just under eye on blue corner of tray, super dangerous with these foam blocks as he almost hit eye." The message was date and time-stamped Tuesday, 12/5/23 at 11:19 AM.  Mrs. Connolly then sent photos of A.C.'s eye where he was at the play center, and the right side of his face was red and starting to swell as if just injured.  Dr. Connolly viewed the photos and saw that it was going to leave a bruise, but the orbital cavity did not appear injured, and the eye was not struck.  Accordingly, Dr. Connolly did not feel it was necessary to take A.C. to the doctor.

## OPERATIVE FACTUAL ALLEGATIONS

### A. Friday, December 15, 2023: Case Routed to DHS Caseworker, Holli Carlson, Who was Notified of Injuries to A.C.

13. On December 15, 2023, at about 11:30 a.m., Oregon Department of Human Services ("DHS") was alerted of a possible incident involving Plaintiff A.C.

14. At 12:40 p.m., Ms. Carlson spoke with the mandated reporter, schoolteacher Grace Nelson (hereinafter "Schoolteacher Nelson" or "the reporter.").

15. Schoolteacher Nelson reported that during the Christmas program the previous night at the school's Christmas program, a young male, approximately 1 to 2 years old was seen with a huge black eye on his right eye.

16. At about 12:50 p.m., Ms. Carlson confirmed A.C. had not been seen by a medical provider at The Center (The Center for Orthopedic and Neurosurgical Care and Research).

17. At 1:12 p.m., Ms. Carlson left a voicemail message with both Mrs. Connolly and Dr. Connolly.  Ms. Carlson also went over to the Connolly residence where she was able to briefly see inside the home through the window for all the main living areas.  Ms. Carlson observed the home to be safe and sanitary.

**B.  Officer Avery's Involvement (December 15, 2023)**

18. Officer Avery contacted Dr. Connolly by phone.  Officer Avery asked Dr. Connolly if he could come by the Connolly house and talk to the children.  Dr. Connolly told Officer Avery that the children likely weren't home and were with Mrs. Connolly at the time.

19. On December 15, 2023, at 4:15 p.m., Officer Jeremy Avery was assigned a DHS Cross Report to investigate the Connolly family.

**C.  Officer Avery Investigated the Connolly Residence (Evening of December 15, 2023)**

20. Officer Avery attempted to contact Mrs. Connolly by phone several times but was unable to reach her.

21. On the evening of December 15, 2023, Officer Avery went to the Connolly residence and attempted in-person contact.  The officer found the Connolly children being watched by the Connolly's second eldest child, Katherine.  Katherine told Officer Avery she was watching the children, and her mother was at Juniper Fitness Center swimming.

22. While Officer Avery was speaking to Katherine, A.C. came to the door.  Officer Avery's report states Officer Avery observed that A.C. had some small, discolored bruising around his right eye consistent with a black eye, that was in the process of healing.  It appeared to be light brown in color and only covered a small area.  Officer Avery did not photograph A.C.  Officer Avery left a business card with Katherine and his report states that he asked Katherine to have Mrs. Connolly call the officer when Mrs. Connolly got home.

**D.  Saturday, December 16, 2023**

23. On Saturday, December 16, 2023, at approximately 7:00 p.m., Officer Avery contacted Dr. Connolly again.  Officer Avery stated that the DHS report mentioned a bruise on A.C.'s face and that he saw A.C. the prior evening. (December 15, 2023).  Officer Avery did not specifically state that he observed a bruise himself or that he had reasonable suspicion that the injury was caused by abuse.  Officer Avery only stated that "because there was bruising to A.C.'s face, he would need to go into the hospital and have a Karly's Law exam completed."  Officer Avery's statements were made prior to the officer asking a single question about what happened to A.C. to cause the injury.

24. Dr. Connolly immediately provided a thorough history of A.C.'s injury, including the date, time, and mechanism.  Dr. Connolly told Officer Avery that there were photos and text messages from the time of that injury corroborating Dr. Connolly and his wife's account of the injury. (*Officer Avery's police report does not acknowledge that the officer had Dr. Connolly's testimony of what happened to A.C. during this phone conversation.)

25. Dr. Connolly asked Officer Avery to explain why a Karly's Law exam needed to be done.  Officer Avery responded that the exam had to be done by a designated medical professional, and there were certain guidelines that must be adhered to. (*The designated

medical center is the Kids Center in Bend.  Its website provides, "KIDS Center is the only child abuse evaluation and treatment center in Central Oregon." There, professionals are specifically trained to do Karly's Law exams.  No x-rays or CT scans are performed at the Kids Center.  The Deschutes County MDT Protocol from 2020 found online also specifies Kids Center as the designated medical professional for Deschutes County pursuant to Karly's Law. ORS 419B.023 and 419B.024.)

26. Officer Avery maintained that according to Karly's Law, an injury to a child who cannot speak for themselves must be evaluated by the designated medical provider.  (*Officer Avery's report also omits Dr. Connolly asking that A.C. be allowed to be evaluated by a pediatrician and the officer refusing to accept that.  The police officer stated that the child must be seen by the Designated Medical Professional and that, in Bend, this was at the St Charles Medical Center Emergency Department.)

27. Officer Avery ordered Dr. Connolly to take A.C. to the Emergency Department to be evaluated. (Officer Avery also mentioned he needed to photograph Plaintiff A.C.)

28. Dr. Connolly asked Officer Avery if his family had the option of taking A.C. to a pediatrician.  Officer Avery bluntly responded, "no," and reiterated that the family was required under Oregon law to take A.C. to the ER within 23 hours.  In stating the Connollys were required to go to the Emergency Department, Dr. Connolly expressed his feeling that the family was being denied the reasonable option of going to the Kid's Center or a pediatrician to have A.C. evaluated.

29. Under protest, Dr. Connolly relented and stated he would get it done.

**E.  December 17, 2023 (Before A.C.'s Medical Examination)**

30. On December 17, 2023, Dr. Connolly sent Officer Avery a text message which showed the text messages between Dr. Connolly and Mrs. Connolly when A.C. received the bruise to his face.  The messages between Dr. Connolly and Mrs. Connolly contain

photos of A.C.'s injuries at the library and discussions about the accident. Dr. Connolly asked Officer Avery if his text message and photos would suffice in lieu of the Karly's Law exam.

31. Even after Officer Avery saw the evidence that A.C.'s injury was an accident, Officer Avery still commanded the Connollys to take A.C. to the Emergency Department for a Karly's Law investigative medical examination without a warrant.

32. On December 17, 2023, at 1:56 p.m., Mrs. Connolly called Bend Police Corporal Jared Wiebold and had a 12-minute conversation regarding his department's compelled Karly's Law investigative medical examination at the Emergency Department of their 1-year-old child. Mrs. Connolly explained that reasonable suspicion is a required criteria to implement Karly's Law, and stated the definition of reasonable suspicion must include "specific and articulable facts" that link the injury to abuse. Corporal Wiebold retorted that only an injury was needed under Karly's Law. Corporal Wiebold could see that Mrs. Connolly and Dr. Connolly had no prior criminal history. When Mrs. Connolly stated Officers must take pictures immediately if they observe injuries, Corporal Wiebold stated Officer Avery has 48 hours to take pictures. When Mrs. Connolly challenged his statement, Corporal Wiebold stated that Officer Avery had, "made a mistake," by not immediately photographing A.C. when he was first observed at the Connolly home on the evening of December 15, 2023.

**F. Mrs. Connolly Took A.C. to the Emergency Department (December 17, 2023)**

33. Mrs. Connolly checked A.C. into the emergency department at St. Charles Medical Center.

34. As Mrs. Connolly was walking back to the waiting room from the intake nurse, Officer Avery walked into the ER. Officer Avery apologized to Mrs. Connolly and stated he didn't take immediate pictures because he didn't want to traumatize the Connolly

children.  Officer Avery took a photo of A.C.'s face, several feet away from A.C. and examined the photo.  Officer Avery then got closer to A.C.'s face, a few inches in front of his right eye, to take another picture since the bruise was hardly noticeable.

35. Officer Avery proceeded to interrogate Mrs. Connolly for several minutes in the ER waiting room until medical staff approached to escort Mrs. Connolly and A.C. to an ED exam room.

36. Upon meeting Dr. Clayton Garthe in the emergency department exam room, Mrs. Connolly explained to Dr. Garthe that she brought A.C. because the police mandated that he be taken to the emergency department for a Karly Law examination.  Mrs. Connolly explained that police did not meet the criteria to implement Karly's Law, since there were no "specific and describable facts" that link A.C.'s injury with abuse.  Mrs. Connolly told Dr. Garthe that Dr. Connolly presented pictures and text messages to the police that proved A.C's injury was due to an accident and asked Dr. Garthe if he wanted to see them.  Dr. Garthe replied, "No."  Mrs. Connolly had already pulled up the pictures on her phone and showed him the relevant photos and text messages that corroborated Mrs. Connolly's testimony and provided evidence of the accidental origin of the injury to Dr. Garthe.  She described in detail A.C.'s accidental fall at the library on December 5, 2023, that resulted in a bruise to his right cheek below his eye.  Mrs. Connolly explained that she sent the pictures to her husband, Dr. Connolly, who is a physician and their oldest daughter, Elizabeth, immediately after the fall.

37. After Mrs. Connolly explained that the criteria for a Karly Law exam had not been met— as reasonable suspicion was never established and she showed proof of an accident through pictures that she took after A.C. fell—Dr. Garthe and his staff proceeded with a CT scan and full-body X-rays without obtaining Plaintiffs' informed consent.

38. At 2:11 p.m., physician Clayton Garthe, MD wrote that Mrs. Connolly came here to the ER "at the order of police."

39. Dr. Garthe ordered imaging of A.C. despite A.C. having none of the 6 clinical predictors of ciTbI (clinical traumatic brain injury), which are "altered mental status, palpable skull fracture, loss of consciousness for >/= 5 seconds, nonfrontal scalp hematoma, severe injury mechanism, and acting abnormally."  Dr. Garthe told Mrs. Connolly that "the train had left the station."  Dr. Garthe did not doubt Mrs. Connolly's explanation for A.C.'s bruise when she showed the doctor the text message chain and photos.  He merely continued to say, "the train has left the station," indicating the decision was outside of his control. (*In his medical report, Dr. Garthe falsely characterized Plaintiff A.C.'s mild forehead bruise as having "no explanation", when Dr. Garthe never asked about it.   Dr. Garthe also falsified that the mild bruise was a hematoma when the doctor knew it was not.)

40. Mrs. Connolly was in the Emergency Department exam room when Dr. Garthe sent in a young staff member whom Mrs. Connolly had never seen or met before to tell Mrs. Connolly that the doctor had ordered a CT scan and full-body x-rays.  Dr. Garthe never mentioned the CT scan or x-rays to Mrs. Connolly.  Dr. Garthe only told Mrs. Connolly that he needed to review the protocol and adhere to it.  Mrs. Connolly opposed the entire examination including the CT scan and x-rays.

41. The CT brain W/O contrast occurred at 3:40 pm.  The XR Bone survey was completed at 4:15 p.m. The radiology reports were completed by the radiologists at 4:08 p.m. and 4:24 p.m.

42. A.C. fought and screamed at the top of his lungs for over 15minutes while Doe Defendants immobilized his body in a blanket straight jacket and wrapped tape-wrap around his forehead to the board multiple times.  A.C. was visibly distress, screaming,

and resisting while immobilized using a papoose-style device and head tape.  As Mrs. Connolly attempted to intervene to stop the scan and retrieve her son, she reached over the shoulders of two hospital staffers who were restraining him.  One of the staffers, Doe 1, (weighing approximately 200 pounds) made physical contact with Mrs. Connolly. Doe 1 moved within inches of Mrs. Connolly's face, and physically blocked her, while stating "two more minutes" in a confrontational tone.

43. Mrs. Connolly backed away and began timing.  After 2 minutes, the staff did not stop immobilizing A.C. as staff had stated and it took over five minutes.  After the CT scan, they walked to x-rays.  Mrs. Connolly was escorted away and told she had to wait in the waiting room for the full-body X-rays.  The wait-room door was shut on her.  Mrs. Connolly was not permitted to observe or be with A.C. during the 15-20 minutes it took to do the x-rays.

44. The CT scan administered subjected Plaintiff A.C. to approximately 2.8 millisieverts (mSv) of radiation, and the full-body X-rays subjected the child to an additional 0.2 mSv. Dr. Garthe and Does 1-10 failed to adjust the radiation dose for pediatric use, applying adult-level exposure to a 19-month-old-child.

45. Officer Avery left the hospital.  In his police report, Officer Avery stated that after the exam and speaking with the family, he did not see anything criminal.  He averred that there was a "solid explanation" for A.C.'s black eye and the parents have it documented in messages and photos.   Officer Avery noted he was going to document it as information but not a criminal report and the matter did not need to be investigated further.

46. Following the x-rays and CT scan, Mrs. Connolly asked the Doe Defendant nurse if she could leave the ER with Plaintiff A.C. The nurse responded by stating that Mrs. Connolly and Plaintiff A.C. were not allowed to leave the facility until the results of the imaging tests were received.

47. While Mrs. Connolly and A.C. were at the Emergency Department, Dr. Connolly was working as an anesthesiologist in the operating room of the same hospital. Dr. Connolly arrived at the end of the examination (just after 4:20 p.m.)—after Mrs. Connolly had been told she could not leave. Together they waited for the results.

**G. Post-Medical Examination Admissions**

48. Following the compelled investigative medical examination, Mrs. Connolly submitted a complaint through the Bend PD website. In response, Lieutenant Beekman contacted the Connollys. On January 4, 2024, the Connollys met with Beekman from 1:00 to 2:45 p.m. at the Bend Police Department. There, Dr. Connolly and Mrs. Connolly detailed the history of David and A.C.'s accidental injuries and the subsequent encounters with Bend Police Officer Avery, Corporal Weibold, and the staff at the emergency department at St Charles Medical Center. Lieutenant Beekman stated Karly's Law was applicable in the Connollys' case because there was a bruise on the face of a child who was unable to speak for himself to describe the origin of the injury. Lieutenant Beekman stated only an injury was needed to perform a Karly's Law exam.

49. On January 9, 2024, Mrs. Connolly and Dr. Connolly met with Ms. Carlson at ODHS. Ms. Carlson stated that for a child who is unable to speak for themselves, the presence of a suspicious injury (such as a bruise on the head or face) by itself is enough to apply Karly's Law and require a medical exam. Ms. Carlson conceded that it was not mandatory for the Karly's Law exam to be completed by the DMP or at the emergency department, and that any medical provider could be seen for this exam because the guidance on this point had been changed a year or two prior to December 2023 to make the Karly's Law examination more accessible.

50. Ms. Carlson told Mrs. Connolly and Dr. Connolly that on December 15, 2023, she received the screening report regarding A.C.'s eye. The initial report did not have any

further information regarding the injury to A.C. from the reporter.   Upon follow-up questioning from Ms. Carlson, the reporting party had no additional information on the observed injury to A.C.  Ms. Carlson attempted to contact Dr. Connolly and Mrs. Connolly on December 15, 2023.  Dr. Connolly called Ms. Carlson multiple times during that day but was not able to speak with her on the phone.  At the end of her workday on December 15, 2023, Ms. Carlson left a message with Dr. Connolly that she had more pressing cases to respond to that day, and that she needed to follow up with the Connolly family after the weekend regarding the bruise on A.C.'s face.

51. During this meeting, Ms. Carlson also told Dr. Connolly and Mrs. Connolly that she had spoken with Officer Avery on December 15, 2023 and shared the information she had received about the accidental injury to David and that A.C. had not yet been seen.  Ms. Carlson also stated that she had requested Officer Avery's police report but had been informed in a letter that there was no written police report from the Bend Police department for this case.

52. On March 5, 2024, Dr. Connolly met with CPS Supervisor, Tanya Cloninger.  Ms. Cloninger confirmed that the statement from DHS Holli Carlson that the Connollys could have seen any medical provider to complete a Karl's Law examination was true. (*According to the City of Bend District Attorney's office, the training material used by the Multidisciplinary Team for Karly's Law is a publicly available video at: (https://oregoncas.org/karlys-law/). The training video is clear at 10:40: "We recognize that not all suspicious physical injuries occur within regular working hours or on call hours when the DMP is available.  If after a reasonable effort, law enforcement or DHS personnel are unable to have the child seen by the DMP, the child must be seen by any available physician."  ORS § 419B.023 (4) provides: "Department or law enforcement personnel shall make a reasonable effort to locate a designated medical professional. If

after reasonable efforts a designated medical professional is not available to conduct a medical assessment within 48 hours, the child shall be evaluated by an available physician, a physician associate licensed under ORS 677.505 to 677.525, or a nurse practitioner licensed under ORS 678.375 to 678.390.")

## TORT CLAIM NOTICE

53. Plaintiffs submitted proper tort notice to the City of Bend under ORS 30.275 on June 7, 2024.

## DOCTRINE OF RESPONDEAT SUPERIOR

54. Under the doctrine of Respondeat Superior, Defendant Central Oregon Emergency Physicians LLC is liable for the acts and omissions of their employee Dr. Garthe.  The City of Bend is liable for the acts and omissions of its employees Officer Avery, Corporal Wiebold and Does 1-10.

## STATE ACTION ON THE PART OF DR. GARTHE AND ST. CHARLES MEDICAL CENTER

55. There is a close nexus between the City's handling of child-abuse investigations and Dr. Garthe's forensic examinations as to make those examinations attributable to the City.

56. Dr. Garthe examines children who may have been victims of abuse, reviews the medical records and other pertinent documents, and forms an opinion about the nature of their injuries because he has a public contractual obligation to do so.

57. Dr. Garthe does not maintain a pediatric practice and does not treat pediatric patients outside of the context of child abuse investigations.

58. Dr. Garthe's examinations occur not because he is in his capacity as a physician and sees a medical need for them, but rather, because a State-created and State-controlled framework mandates that he do so.

59. Dr. Garthe is a private doctor to whom the State has essentially turned over the responsibility for providing a medical basis to support or refute a claim of possible child abuse.

60. Dr. Garthe's child abuse examinations are not private medical functions. They are necessary components of a comprehensive government framework for investigating and resolving cases of suspected child abuse. They have no independent medical value aside from their serving as a predicate for a child-abuse investigation by the police and indictment by the prosecutor.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Fourth Amendment Violation—Unreasonable Search and Seizure (42 U.S.C. § 1983)**

**(Plaintiff A.C. Against Defendants Officer Avery, Dr. Garthe, and DOES 1-10)**

61. Plaintiffs re-allege all relevant paragraphs as though fully set forth herein.

62. Plaintiff A.C. was subjected to an investigatory physical examination absent parental consent.

63. There were no exigent circumstances present to except the warrant requirement. There were no specific, articulable facts demonstrating that A.C. was in imminent danger of abuse. There was no immediate medical need for the investigatory physical examination of Plaintiff A.C. There was no urgent medical problem which justified bypassing judicial approval prior to the compelled physical examination.

64. Plaintiffs Mrs. Connolly and Nicholas Connolly did not consent to the compelled and unreasonable medical examination of Plaintiff A.C.

65. Neither Officer Avery, Dr. Garthe, nor the Emergency Room personnel informed Mrs. Connolly that she had the right to give or decline consent based on the specific treatment

suggested for their child rather than merely providing wholesale consent for all medical treatment.

66. Mrs. Connolly's submission to the medical examination was out of obedience to Officer Avery and Dr. Garthe's joint show of authority. Mrs. Connolly presented to the Emergency Department with A.C. at the order of police.

67. A reasonable person would not have interpreted Mrs. Connolly's compelled submission to the medical examination to mean that Mrs. Connolly authorized her 1-year-old son to be x-rayed and Cat Scanned.

68. Defendant Officer Avery did not obtain a warrant for the compelled and unreasonable medical examination of Plaintiff A.C. Defendant Dr. Garthe knew that Defendant Officer Avery had not obtained a warrant for the compelled investigatory medical examination of Plaintiff A.C. Dr. Garthe was also aware that Plaintiff Mrs. Connolly had voiced her opposition to the compelled medical examination.

69. Dr. Connolly had provided a thorough history of A.C.'s injury, including the date, time, and mechanism. Dr. Connolly told Officer Avery that there were photos and text messages from the time of that injury corroborating Dr. Connolly and his wife's account of the injury. Dr. Connolly even sent Officer Avery the text message which showed the text messages between Dr. Connolly and Mrs. Connolly when A.C. received the injury to his face. The messages between Dr. Connolly and Mrs. Connolly contain photos of A.C.'s injuries at the library and discussions about the accident.

70. At the Emergency Department, Mrs. Connolly explained to Dr. Garthe that Dr. Connolly had presented pictures and text messages to the police that prove the accident. Mrs. Connolly showed the text message chain to Dr. Garthe. Dr. Garthe did not doubt Mrs. Connolly's explanation for A.C.'s bruise when she showed the doctor the text message chain and photos. Dr. Garthe merely responded, "The train has left the station;" and

proceeded with the investigatory medical examination even though he knew no reasonable suspicion existed.

71. Defendant Officer Avery failed to pursue reasonable avenues of investigation prior to ordering Plaintiff A.C. to undergo the investigatory physical examination at the Emergency Department.

72. Any slight suspicion Officer Avery initially may have had when he learned of a bruise on A.C.'s face—was no longer reasonable because the Connollys had dispelled it.

73. Officer Avery's subjective slight suspicion dissipated upon seeing the text message chain he later admitted was a "solid explanation."

74. After the Connollys sent the text message chain, neither Officer Avery nor Dr. Garthe had a shred of reasonable suspicion.

75. Defendant Officer Avery's actions were the actual and proximate cause of the Fourth Amendment violation of Plaintiff A.C.'s constitutional rights.

76. Defendant Dr. Garthe's actions were the actual and proximate cause of the Fourth Amendment violation of Plaintiff A.C.'s constitutional rights.

77. Plaintiff A.C. is entitled to economic and noneconomic damages in an amount to be determined by jury at the time of trial.

78. Defendant Officer Avery's actions were malicious, oppressive or in reckless disregard of Plaintiff's rights; and therefore, Plaintiff seeks punitive damages.

79. Defendant Dr. Garthe's actions were malicious, oppressive or in reckless disregard of Plaintiff's rights; and therefore, Plaintiff seeks punitive damages.

80. Pursuant to 42 U.S.C. §§ 1988, Plaintiff is entitled to an award of attorney's fees, expert witness fees, and costs incurred.

## SECOND CLAIM FOR RELIEF

**Fourteenth Amendment Violation—Familial Association (42 U.S.C. § 1983)**

**(All Plaintiffs Against Defendants Officer Avery, Dr. Garthe, and DOES 1-10)**

81. Plaintiffs re-allege all relevant paragraphs as though fully set forth herein.

82. Defendant Dr. Garthe—with the assistance of Defendant Officer Avery—performed an investigatory, physical examination of Plaintiff A.C. without obtaining parental consent or judicial authorization.

83. There was no reasonable concern that material physical evidence might dissipate or that some urgent medical problem existed requiring immediate medical attention as it related to Plaintiff A.C.

84. Plaintiffs Mrs. Connolly and Dr. Connolly were the subject of a continuing investigation when Defendant Officer Avery ordered Plaintiff A.C. to immediately undergo a physical, investigatory examination.

85. Defendant Avery and Defendant Garthe's actions interfered with A.C.'s familial relationship with his parents.  Defendant Avery and Defendant Garthe's actions also shocks the conscience.

86. Defendant Officer Avery's actions were the actual and proximate cause of the Fourteenth Amendment violation of Plaintiffs A.C., Mrs. Connolly, and Nicholas Connolly's constitutional rights.

87. Defendant Dr. Garthe's actions were the actual and proximate cause of the Fourteenth Amendment violation of Plaintiffs A.C., Mrs. Connolly, and Nicholas Connolly's constitutional rights.

88. Plaintiffs are entitled to noneconomic damages in an amount to be determined by jury at the time of trial.

89. Defendant Officer Avery's actions were malicious, oppressive or in reckless disregard of Plaintiff's rights; and therefore, Plaintiff seeks punitive damages.

90. Defendant Dr. Garthe's actions were malicious, oppressive or in reckless disregard of Plaintiff's rights; and therefore, Plaintiff seeks punitive damages.

91. Pursuant to 42 U.S.C. §§ 1988, Plaintiffs are entitled to an award of attorney's fees, expert witness fees, and costs incurred.

## THIRD CLAIM FOR RELIEF

### Fourteenth Amendment Violation—Procedural Due Process (42 U.S.C. § 1983)

### (All Plaintiffs Against Defendants Officer Avery, Dr. Garthe, and DOES 1-10)

92. Plaintiffs re-allege all relevant paragraphs as though fully set forth herein.

93. There was zero imminent danger to Plaintiff A.C at the time the investigatory physical examination was administered.

94. There was reasonably sufficient time for Defendant Officer Avery to seek prior judicial authorization, *ex parte* or otherwise, before ordering Plaintiff A.C. undergo the compelled investigatory physical examination at the Emergency Department.

95. Over Plaintiff Mrs. Connolly and Dr. Connolly's objections, Officer Avery compelled and unilaterally arranged for Plaintiff A.C. to be examined at the emergency room.

96. Officer Avery's arrangement to have Plaintiff A.C. medically examined at the emergency room without a warrant and without consent violated Plaintiffs' procedural due process. Officer Avery could have even allowed A.C. to be examined by the medical provider of Mrs. Connolly and Dr. Connolly's choice, as they had offered.

97. If Defendant Officer Avery had sought a warrant or court order to compel Plaintiff A.C. to undergo an invasive investigatory physical medical examination (where x-rays and CT scans were taken) a court would certainly deny such a request—especially with the

exculpatory evidence Officer Avery possessed which clearly indicated that the small

bruise to Plaintiff A.C.'s eye was not related to any suspected child abuse.

98. Defendant Officer Avery's actions were the actual and proximate cause of the Fourteenth

Amendment violation of Plaintiffs A.C., Mrs. Connolly, and Nicholas Connolly's

constitutional rights.

99. Defendant Dr. Garthe's actions were the actual and proximate cause of the Fourteenth

Amendment violation of Plaintiffs A.C., Mrs. Connolly, and Nicholas Connolly's

constitutional rights.

100.    Plaintiffs are entitled to noneconomic damages in an amount to be determined by

jury at the time of trial.

101.    Defendant Officer Avery's actions were malicious, oppressive or in reckless

disregard of Plaintiff's rights; and therefore, Plaintiff seeks punitive damages.

102.    Pursuant to 42 U.S.C. §§ 1988, Plaintiffs are entitled to an award of attorney's

fees, expert witness fees, and costs incurred.

### FOURTH CLAIM FOR RELIEF

### Supervisory Liability – 42 U.S.C. § 1983

### (All Plaintiffs Against Defendant Corporal Wiebold and DOES 1-10)

103.    Plaintiffs re-allege all relevant paragraphs as though fully set forth herein.

104.    Supervisory Defendant Corporal Wiebold and DOES 1-10 acted under color of

state law.

105.    The acts and failure(s) to act of the supervisory defendant's subordinate(s)

deprived Plaintiff of particular rights under the laws of the United States and the United

States Constitution.

106.    The supervisory defendants directed his subordinate in the acts and failures to act

that deprived Plaintiff of these rights.

107.    The supervisory defendants set in motion a series of acts by his subordinate or knowingly refused to terminate a series of acts by his subordinate, that the supervisor knew or reasonably should have known would cause the subordinates to deprive Plaintiff of these rights.

108.    The supervisory defendants knew that the subordinate was engaging in these acts and knew or reasonably should have known that the subordinate's conduct would deprive Plaintiff of these rights.

109.    The supervisory defendants failed to act to prevent the subordinate from engaging in such conduct.

110.    The supervisory defendants disregarded the known or obvious consequence that a particular training deficiency or omission would cause his subordinates to violate Plaintiff's constitutional rights.

111.    That deficiency or omission actually caused the subordinates to deprive Plaintiff of Plaintiff's constitutional rights.

112.    The supervisory defendants engaged in conduct that showed a reckless or callous indifference to the deprivation by the subordinate of the rights of others.

113.    The supervisory defendants' conduct was so closely related to the deprivation of the plaintiff's rights as to be the moving force that caused the ultimate injury.

114.    Plaintiff is entitled to noneconomic damages in an amount to be determined by jury at the time of trial.

115.    All defendants' actions were malicious, oppressive or in reckless disregard of Plaintiff's rights; and therefore, Plaintiff seeks punitive damages.

116.    Pursuant to 42 U.S.C. §§ 1988, Plaintiff is entitled to an award of attorney's fees, expert witness fees, and costs incurred.

## FIFTH CLAIM FOR RELIEF

### Municipal Liability (*Monell*) (42 U.S.C. § 1983)

### (All Plaintiffs Against Defendant City of Bend (Bend Police Department; and St. Charles Medical Center *via* State Action))

117.    Plaintiffs re-allege all relevant paragraphs as though fully set forth herein.

118.    The acts and failures to act of the individual officers deprived Plaintiffs of their particular rights under the laws of the United States and the United States Constitution.

119.    The individual defendants acted under color of state law.

120.    The training policies of Bend Police Department and St. Charles Medical Center were not adequate to prevent violations of law by its employees.

121.    The training policies of Bend Police Department and St. Charles Medical Center were not adequate to train its police officers and employees to handle the usual and recurring situations involving investigatory physical examinations pursuant to Karly's Law.  Plaintiffs told the individual defendants that the City of Bend and St. Charles Medical Center were violating their constitutional rights.  Despite the amount of time the individual defendants had to consult and research the issue of parental rights in relation to Karly's Law, Bend Police Department supervisory officers double-downed by stating that only an injury was needed in order to conduct a compelled Karly's Law exam on a child.

122.    On information and belief, after the Bend Police Department and St. Charles Medical Center violated Plaintiffs' constitutional rights, Bend Police Department and St. Charles Medical Center did nothing to train officers and medical personnel regarding the full protections under Karly's Law—to children and parents alike, such as Plaintiffs. Still today, Bend Police Department and St. Charles Medical Center operates under the legal fallacy that children are compelled to undergo an investigatory physical examination so long as the child exhibits a sign of injury.

123.    Bend Police Department and St. Charles Medical Center neglected to provide adequate training for its officers and supervisors to identify rights afforded to parents who object to orders by police officers to submit to a compelled investigatory physical examination.

124.    Bend Police Department and St. Charles Medical Center were deliberately indifferent to the substantial risk that its policies were inadequate to prevent constitutional violations and violations of law by its officers.

125.    Bend Police Department and St. Charles Medical Center were deliberately indifferent to known or obvious consequences of its failure to train its police officers adequately as to parent's rights who object to orders by police officers to submit to a compelled investigatory physical examination pursuant to Karly's Law.

126.    The failure of Bend Police Department and St. Charles Medical Center to prevent violations of law by its employees and to provide adequate training caused the deprivation of Plaintiffs' rights by the individual officers; that is, the defendant's failure to prevent constitutional violations and violations of law by its employees and to train played a substantial part in bringing about or actually causing the injury or damage to Plaintiff.

127.    Bend Police Department officers (including Corporal Wiebold and Officer Avery) failed to receive training regarding a parent's rights to object to orders by police officers to submit to a compelled investigatory physical examination pursuant to Karly's Law.

128.    The failure of the Bend Police Department to provide training to Defendants Officer Avery and Corporal Wiebold led to actions that indicated a prioritization of the policies of the Bend Police Department over Fourth and Fourteenth Amendment binding case law.

129.     St. Charles Medical Center and Bend Police Department's official policy or widespread or longstanding practice or custom was that police officers were at liberty to order children to undergo investigatory physical examinations if a child exhibits signs of an injury.

130.     St. Charles Medical Center and Bend Police Department's official policy or widespread or longstanding practice or custom caused the deprivation of Plaintiffs' rights by the individual defendants; that is, St. Charles Medical Center and Bend Police Department's official policy or widespread or longstanding practice or custom is so closely related to the deprivation of Plaintiffs' rights as to be the moving force that caused Plaintiffs' ultimate injury.

131.     After A.C.'s compelled examination, Plaintiffs Mrs. Connolly and Dr. Connolly lodged a complaint with Bend Police Department.  Plaintiffs Mrs. Connolly and Dr. Connolly met with Lieutenant Beekman who ratified Officer Avery's conduct and stated that it was Bend PD's official policy that only an injury was needed to perform a Karl's Law exam.  Bend Police Department ratified the unlawful search and seizure of Plaintiff A.C. and the infringement upon Plaintiffs' Fourteenth Amendment due process rights.

132.     Dr. Garthe followed St. Charles' policy in administering the physical examination of Plaintiff A.C.  The policy was deficient because it required the doctor to conduct a physical examination in spite of dissipated suspicion.

133.     Plaintiffs are entitled to economic and noneconomic damages in an amount to be determined by jury at the time of trial.

134.     Pursuant to 42 U.S.C. §§ 1988, Plaintiffs are entitled to an award of attorney's fees, expert witness fees, and costs incurred.

## SIXTH CLAIM FOR RELIEF

### Failure to Intervene

### (All Plaintiffs Against Defendant Officer Avery)

135.     Plaintiffs re-allege all relevant paragraphs as though fully set forth herein.

136.     Defendant Officer Avery was acting under color of state law.

137.     Dr. Garthe's physical child abuse examination—deficient of reasonable suspicion—violated Plaintiffs' constitutional rights.

138.     Officer Avery had knowledge of the detention of the hospital because he was present, and knew that Plaintiff A.C. would be subjected to an unlawful physical examination.

139.     Officer Avery had a realistic opportunity to prevent the constitutional violation but failed to act.

140.     Officer Avery's failure to intervene is a proximate cause of the Plaintiffs' constitutional injuries.

141.     Officer Avery's actions were malicious, oppressive or in reckless disregard of Plaintiffs' rights; and therefore, Plaintiffs seek punitive damages.

142.     Pursuant to 42 U.S.C. §§ 1988, Plaintiffs are entitled to an award of attorney's fees, expert witness fees, and costs incurred.


## SEVENTH CLAIM FOR RELIEF

### False Imprisonment

### (Plaintiff A.C. Against Defendants Officer Avery, City of Bend, Dr. Garthe, and Central Oregon Emergency Physicians, LLC, and DOES 1-10)

143.     Plaintiffs re-allege all relevant paragraphs as though fully set forth herein.

144.     Defendants Officer Avery and Dr. Garthe intended to confine Plaintiff A.C. in order to undergo the compelled investigatory Karly's Law examination.

145.     Plaintiff A.C. was confined within fixed boundaries.  Defendants Officer Avery and Dr. Garthe caused Plaintiff A.C. to be confined.

146.     Plaintiff A.C. was both aware of the confinement and harmed by it.

147.     The confinement was without the consent of either Plaintiff A.C., Plaintiff Mrs. Connolly, or Plaintiff Nicholas Connolly.

148.     The confinement was not otherwise legally justified.

149.     Defendant Dr. Garthe was employed by Defendant Oregon Emergency Physicians, LLC, and acting in the course of his employment at the time of the compelled investigatory Karly's Law examination.

150.     Defendants Officer Avery and Dr. Garthe actions were the actual cause of Plaintiff A.C.'s confinement and harms and losses flowing from the confinement.

151.     Plaintiffs are entitled to economic and noneconomic damages in an amount to be determined by jury at the time of trial.

152.     Defendant Officer Avery and Defendant Dr. Garthe's actions were malicious, oppressive or in reckless disregard of Plaintiffs' rights; and therefore, Plaintiffs seek punitive damages.

## EIGHTH CLAIM FOR RELIEF

### Battery

### (Plaintiff A.C. Against Defendants Officer Avery, City of Bend, Dr. Garthe, Central Oregon Emergency Physicians, LLC, and DOES 1-10)

153.     Plaintiffs re-allege all relevant paragraphs as though fully set forth herein.

154.     Defendant Dr. Garthe intentionally made contact with Plaintiff. A.C.

155.     The contact was offensive to a reasonable person.

156.     Dr. Garthe did not obtain consent to conduct the investigatory physical medical examination.  Dr. Garthe did not obtain consent pursuant to ORS section 677.097. Plaintiff A.C. did not have the capacity to consent.  Neither Plaintiff Mrs. Connolly nor Dr. Nicholas Connolly consented to the invasive contact of their one-year-old child.

157.     Defendant Dr. Garthe's conduct directly caused the offensive contact to Plaintiff A.C.

158.     Officer Avery's conduct was a voluntary act intended to cause offensive contact to Plaintiff A.C.

159.     Officer Avery's indirect actions constituted an intentional act that directly resulted in the offensive contact to Plaintiff A.C.  Officer Avery was an integral participant in aiding and assisting the offensive contact to Plaintiff A.C.

160.     Defendant Dr. Garthe was employed by Defendant Central Oregon Emergency Physicians, LLC, and acting in the course of his employment at the time of the compelled investigatory Karly's Law examination.

161.     Defendants Officer Avery and Dr. Garthe's actions were the actual cause of Plaintiff A.C.'s offensive contact and harms and losses flowing from the contact.

162.     Plaintiff A.C. is entitled to economic and noneconomic damages in an amount to be determined by jury at the time of trial.

163.     Defendant Officer Avery and Defendant Dr. Garthe's actions were malicious, oppressive or in reckless disregard of Plaintiffs' rights; and therefore, Plaintiffs seek punitive damages.

## NINTH CLAIM FOR RELIEF

### Assault

### (Plaintiff A.C. Against Defendant Dr. Garthe; Central Oregon Emergency Physicians, LLC, and DOES 1-10 / Plaintiff Angela Connolly Against Central Oregon Emergency Physicians, LLC, and DOES 1-10)

164.    Plaintiffs re-allege all relevant paragraphs as though fully set forth herein.

165.    Defendant Dr. Garthe engaged in a volitional act.

166.    Defendant Dr. Garthe's volitional act was made with the intent to cause harmful contact to Plaintiff A.C.

167.    Defendant Dr. Garthe had the ability to carry that intent into effect.

168.    Defendant Doe 1 engaged in a volitional act.   Doe 1 forcibly restrained A.C. despite Mrs. Connolly's repeated objections.  A.C. was visibly distress, screaming, and resisting while immobilized using a papoose-style device and head tape.  As Mrs. Connolly attempted to intervene to stop the scan and retrieve her son, she reached over the shoulders of two hospital staffers who were restraining him.  One of the staffers, Doe 1 (weighing approximately 200 pounds) made physical contact with Mrs. Connolly.   Doe 1 moved within inches of Mrs. Connolly's face, and physically blocked her, while stating "two more minutes" in a confrontational tone.

169.    Defendant Dr. Garthe was employed by Defendant Central Oregon Emergency Physicians, LLC, and acting in the course of his employment at the time of the compelled investigatory Karly's Law examination.

170.    Defendants Dr. Garthe and Does 1-10's actions were the actual cause of Plaintiff A.C. and Plaintiff Angela Connolly's harms and losses flowing from the assault.

171.    Plaintiffs A.C. and Angela Connolly are entitled to economic and noneconomic damages in an amount to be determined by jury at the time of trial.

172.    Defendant Dr. Garthe and Doe 1-10's actions were malicious, oppressive or in reckless disregard of Plaintiffs' rights; and therefore, Plaintiffs seek punitive damages.

## TENTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress

### (Plaintiff A.C. Against Defendants Officer Avery, City of Bend, Dr. Garthe, and Central Oregon Emergency Physicians, LLC)

173.    Plaintiffs re-allege all relevant paragraphs as though fully set forth herein.

174.    Defendants acted with the intent to cause emotional distress or with reckless disregard of the likelihood that such distress would result from their conduct.

175.    The defendants' actions were so extreme and outrageous that they go beyond all possible bounds of decency and are considered atrocious and utterly intolerable in a civilized community.

176.    There is a causal connection between the defendants' conduct and the emotional distress suffered by Plaintiff A.C.

177.    The emotional distress experienced by Plaintiff A.C. was so severe that no reasonable person could be expected to endure it.

178.    The defendants acted with reckless disregard of the likelihood of causing such distress.

179.    Defendant Dr. Garthe was employed by Defendant Central Oregon Emergency Physicians, LLC, and acting in the course of his employment at the time of the compelled investigatory Karly's Law examination.

180.     Plaintiff A.C. is entitled to economic and noneconomic damages in an amount to

be determined by jury at the time of trial.

181.     Defendant Officer Avery and Defendant Dr. Garthe's actions were malicious,

oppressive or in reckless disregard of Plaintiffs' rights; and therefore, Plaintiffs seek

punitive damages.

## ELEVENTH CLAIM FOR RELIEF

### Negligence

### (All Plaintiffs Against All Defendants)

182.     Plaintiffs re-allege all relevant paragraphs as though fully set forth herein.

183.     The individual defendants owed Plaintiffs a duty of care.

184.     The individual defendants breached that duty.  Defendants unreasonably created

the risk that Plaintiffs would be harmed through their conduct.  Defendants negligently

caused foreseeable, serious emotional distress and also infringed on Plaintiff's legally

protected interests.

185.     The breach of the duty was the cause-in-fact of legally cognizable damage to

Plaintiffs.

186.     Defendant Dr. Garthe was employed by Defendant Central Oregon Emergency

Physicians, LLC, and acting in the course of his employment at the time of the compelled

investigatory Karly's Law examination.

187.     Plaintiffs are entitled to economic and noneconomic damages in an amount to be

determined by jury at the time of trial.

**TWELFTH CLAIM FOR RELIEF**

**Gross Negligence**

**(All Plaintiffs Against All Defendants)**

188.    Plaintiffs re-allege all relevant paragraphs as though fully set forth herein.

189.    Defendants owed a duty of care to the Plaintiffs.

190.    The defendants breached that duty through conduct that amounted to a conscious indifference to the safety, rights, or welfare of others; and a reckless disregard of the consequences of their actions.

191.    The defendants' grossly negligent conduct was a substantial factor in causing harm to the Plaintiffs.

192.    The plaintiffs suffered actual harm or injury as a result.

193.    Plaintiffs are entitled to economic and noneconomic damages in an amount to be determined by jury at the time of trial.

**THIRTEENTH CLAIM FOR RELIEF**

**Medical Malpractice**

**(Plaintiff A.C. Against Defendants Dr. Garthe, Central Oregon Emergency Physicians, LLC, and DOES 1-10)**

194.    Plaintiff re-alleges all relevant paragraphs as though fully set forth herein.

195.    Dr. Garthe and Does 1-10 owed a professional duty of care to Plaintiff A.C.

196.    Dr. Garthe and Does 1-10 failed to exercise the degree of care, skill, and diligence that is ordinarily exercised by other doctors in the same or similar circumstances (i.e., a deviation from the accepted standard of care).  Medical authorities constantly warn against unnecessary CT imaging in children.  The American College of Radiology (ACR) recommends that CT scans be used only when clearly indicated and alternatives like

ultrasound or MRI are not appropriate.  The Image Gently Alliance, a consortium of radiology organizations including the ACR and Society for Pediatric Radiology, urges extreme caution in pediatric imaging, citing the significantly higher radiation sensitivity to young children.  A 2012 study in the Lancet by Pearce et al. linked pediatric CT exposure to increased risks of leukemia and brain tumors.  The study found that two to three head CTs in childhood could triple the risk of brain cancer.

197.    Dr. Garthe and Does 1-10 breached their duty of care by (a) conducting medically unnecessary and excessive imaging; (b) failing to adjust procedures for a child patient; (c) proceeding without informed parental consent; (d) engaging in unethical and inappropriate physical restraint; (e) failing to review a warrant or court order before removing patient and parental rights.

198.    Dr. Garthe's breach of the standard of care was the proximate cause of Plaintiff A.C.'s injury and harm.  Plaintiff A.C. was unnecessarily exposed to radiation and experienced trauma.

199.    Dr. Garthe's negligence was a substantial factor in bringing about the harm to Plaintiff A.C.

200.    Plaintiff A.C. suffered actual harm, including pain and suffering, emotional distress, and additional medical costs.  Additionally, Plaintiff A.C. suffered a violation of bodily integrity through non-consensual and unnecessary procedures.

201.    Dr. Garthe acted with gross negligence, willful misconduct, or a reckless and outrageous indifference to a highly unreasonable risk of harm; and therefore, Plaintiff A.C. seeks punitive damages.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court grant the following relief:


**Complaint** 32 of 33

A.  For general damages according to proof—including, but not limited to
emotional distress to Plaintiffs knowing their child faces a heightened
cancer risk;

B.  For special damages according to proof—including, but not limited to, the
cost of future medical monitoring to detect early signs of cancer; and the
loss of chance or reduction in life expectancy attributable to the exposure;

C.   For punitive against individual defendants to be determined at trial;

D.  For attorney's fees incurred by the Plaintiffs pursuant to 42 U.S.C. § 1988;

E.  For an award against Defendants and in favor of Plaintiffs of all costs
incurred herein by Plaintiffs;

F.  An award for statutory attorney's fees, expert witness fees, and costs
incurred; and

G.  For such other and further relief as the Court deems just and proper.


Signed and dated this 31st day of July 2025.

Respectfully submitted


/s/ Jina Clark, Esq.
Jina Clark, OSB No. 000319
(Formerly Jennie Clark)
Clark Law and Associates, LLC
6501 SW Macadam Ave. Suite E
Portland, OR   97239